### NISSHO IWAI AMERICAN CORPORATION, Nike, Inc., Plaintiffs,

v.

### UNITED STATES, Defendant.

Slip Op. 97–69.
Court No. 90–11–00584.

United States Court of International Trade.

May 30, 1997.

---

**518**

Stein Shostak Shostak & O'Hara (James F. O'Hara) and Law Offices of Michael P. Maxwell (Michael P. Maxwell), Los Angeles, CA, for plaintiffs.

Frank W. Hunger, Assistant Attorney General, Washington, DC; Joseph I. Liebman, Attorney–in–Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Barbara M. Epstein, Barbara Silver Williams); United States Customs Service (Chi Choy, New York City, Office of Assistant Chief Counsel, International Trade Litigation), for defendant.

### *DECISION AND JUDGMENT ON CROSS–MOTIONS FOR SUMMARY JUDGMENT*

WATSON, Senior Judge.

This test case involves a tariff term in which footwear is described as having a "foxing-like band." As a result of the Govern-

ment's decision that the fifteen models of athletic footwear at issue had "foxing-like bands," the importer could not enter them under subheadings 6402.91.40 and 6402.99.15 of the Harmonized Tariff Schedule of the United States (HTSUS). Under those subheadings the footwear would have been dutiable at 6%.

Instead, as a consequence of being found to have "foxing-like bands," the footwear, depending on the model, was classified under subheadings 6402.91.80, 6402.91.90 and 6402.99.90 of the HTSUS and assessed with duty at 20% or 90 cents a pair plus 20%.

The legal issue in this case is whether these importations are described by the specific exception to subheadings 6402.91.40 and 6402.99.15 as "footwear having a foxing or foxing-like band applied or molded at the sole and overlapping the upper." There are no genuine issues of fact, only a few factual skirmishes of the type that always accompany a hotly contested case.[1]

A short description of the structure of the importations together with an illustrative photograph of a sample [Fig.1], will make it easier to understand where the parties differ. On the bottom of the footwear at issue is a sole of rubber, a bottom piece that occupies the traditional place of the sole of the shoe. That bottom piece has a wavy edge that occasionally goes up noticeably higher than the flat interior. Those high spots extend above the line where the upper part of the shoe joins the lower part.

Above the bottom piece is another piece that fits on to the bottom. The second piece is a mid-sole made of polyurethane or ethylene vinyl acetate (EVA). Nike calls it a "foot frame." It resembles the bottom piece and also has a wavy perimeter with portions that rise above the junction with the upper part of the shoe when they are put together. The bottom sole and the mid-sole are cemented together. Then the plastic upper portion of the shoe is joined to the lower. As a result, the two portions of the sole just

---

1. Fox example, there are inconsequential disputes about whether certain Customs officers said to representatives of Nike that the importations did not have "foxing-like bands." These are inconsequential because the Customs service is not bound by the oral opinions or advice of its personnel. 19 CFR § 177.1(b). There is also a dispute about the extent to which the sole overlaps the upper on Style No. 5520.

described overlap the upper at various points around the perimeter of the shoe, creating a wavy effect. At some points the overlap rises up from the bottom sole; at others, it comes from the mid-sole.

The plaintiffs' main argument is that, while the overlap coming from the bottom sole can be foxing or foxing-like, the overlap from the mid-sole cannot. Plaintiffs argue that the overlap from the mid-sole is not within the meaning of foxing, or foxing-like band, and further argue that to treat it as such goes beyond the intention of the parenthetical exception written by Congress, contradicts legislative history and is counter to the Customs Service's prior interpretation of the term.

Plaintiffs argue extensively that the primary purpose of the mid-sole "foot frame" is to provide motion control and stability for athletic use of the footwear. They contrast this purpose and design with that of "foxing." Plaintiffs point out that "foxing" was originally a separate band that went around a shoe and was designed to secure the upper to the sole and, at the same time, to conceal the line of juncture between the upper and the sole band. Plaintiffs argue that its foot frame mid-sole is not like foxing in any significant respect in that it does not bond the upper to the sole and does not conceal a juncture line between upper and lower parts of the shoe. On the question of whether the visual attributes of the importations resemble foxing, the plaintiffs insist that consumers make a meaningful distinction between the importations and shoes that have the appearance of original foxing.[2]

It is the view of the court that the dissimilarity of the entire mid-sole to "foxing" can be accepted. But that is not the crux of the matter. It is the effect of the externally visible portions that must be evaluated. If the problem before the Court was simply classifying the mid-sole, and we were faced with competing provisions for "foxing" and for, let us say, "structural elements" of footwear, the application of the foxing language would be weak. In that situation, the major functional role of the mid-sole would have controlling importance. But here it is only the effects of the external resemblance to

**2.** This argument is rejected on the ground that the issue before the court is not one that can be determined or decided by reference to the perceptions of consumers.

foxing that is important. In this situation, the real question is if the scalloped perimeter of the mid-sole is somehow precluded from being considered as like foxing in its relation to the exterior of the shoe.

Since the statutory language does not give us a clear understanding of what is meant by "foxing-like band" it becomes necessary to examine the legislative history. That history makes it clear that the term "foxing-like band" arose from a general and continuing intention to provide an increased level of tariff protection to the domestic rubber footwear industry. Under the Tariff Act of 1930, most footwear was classifiable under ¶ 1530(e), a provision which made footwear whose uppers were in chief value of non-leather material dutiable at a higher rate than those whose uppers were in chief value of leather. The provisions of ¶ 1530(e) for footwear with uppers made of material other than rubber was later subdivided into six categories depending on the sole material, one of which was for footwear "with soles wholly or in chief value of India rubber or substitutes for rubber." Apparently, importation of rubber-soled shoes continued to threaten the existence of the American rubber footwear industry to the point where a Presidential proclamation was issued in 1933, designed to further increase the amount of duty owed by importations. Imported rubber-soled shoes with fabric uppers continue to be assessed with a 35% duty under ¶ 1530(e) but the assessment was based on the American Selling Price for a comparable domestic shoe, a value which would presumably have been higher than that of the imported shoe. This American Selling Price, or "ASP" valuation was intended as a tariff protection against rubber footwear designed for protection against rain, and rubber-soled footwear which was used for sports. In subsequent years there ensued a series of measures and counter-measures by the importers and the Government. At first importers were able to design around the onerous ASP valuation by doing such things as inserting a leather "filler" between the insole and the outer sole. Footwear that otherwise would have been valued on the basis of ASP escaped that higher valuation because the leather filler rendered the sole in chief value

of leather rather than rubber. In response, Congress amended ¶ 1530(e) in 1954 to provide that footwear would be considered as having a sole in chief value of rubber if a major portion of the outer sole alone was composed of rubber or substitutes of rubber. Thereafter importers found a way to design around the new provision by adding the leather to the tongue or other parts of the shoe upper, making the shoes as a whole in chief value of leather and thereby removing them from the ASP valuation. In 1958 Congress responded to that development by again amending ¶ 1530(e) to add a "material of chief surface area" test to the existing "material of chief value" test. In other words, inasmuch as the insertion of a small amount of high-value leather did not affect the chief surface area of the shoe, it would no longer be successful in getting the shoe classified as one with a leather upper or as in chief value of leather.

As summarized in the Tariff Classification Study of 1960:

> The Congress has twice enacted legislation "to close the loophole in the Tariff laws by which foreign producers are, by artful manipulation of a product, avoiding an import duty imposed specifically for the protection of the domestic rubber-soled footwear industry."

In the Customs Simplification Act of 1954, P.L. 83–768 (1954), Congress authorized the Tariff Commission to study, modernize and redraft the Tariff Schedules then in effect under the Tariff Act of 1930. The resulting Tariff Schedules of the United States took a new approach to the classification of footwear. Congress created three HTSUS provisions for rubber and plastic footwear—Items 700.50, 700.55, and 700.60 of the HTSUS. Congress also employed the phrase "foxing or foxing-like bands" to describe that category of footwear that should not escape the ambit of ASP. Item 700.60 of the HTSUS was intended to include the broad classification of imported rubber-soled footwear which was subject to "ASP," including rubber-soled athletic type footwear with fabric or plastic coated uppers. The Tariff Classification Study specifically stated that the parenthetical exception for footwear hav-

ing foxing or a foxing-like band was "designed to ensure classification in Item 700.60 of a style of imported shoe with plastic coated uppers but having the general outward appearance of the traditional 'sneaker or tennis shoe.'" *TCS, DX* 16 at 24. It is clear that the third category of footwear intended to be governed by the "foxing-like band" exception included rubber-soled athletic footwear.

■ Given the clear intention discernible from the legislative history, the question becomes whether there is any thing about the importations at issue that distinguishes them in a meaningful way from the athletic footwear that was the subject of legislative concern. The plaintiffs have not persuaded the Court that these importations are different in a tariff sense from the so called "traditional" athletic footwear or "sneakers" of the past. There is no question that the appearance or style or "image" of this variety of new athletic footwear has changed, however, its basic function and its basic position in the larger spectrum of footwear has not changed. The Court is not persuaded that the presence of a "foot frame mid-sole" in this new style of athletic footwear is a development of such a transforming nature that it changes the basic function and identity of the importations. It may well be a significant technical achievement in the search for better athletic footwear. However, it would be unreasonable to treat this mid-sole component as something so radical that it breaks the association of these importations with those products that have long been the subject of special Congressional concern.

■ None of what has been said here is intended to characterize the "footframe mid-sole" as part of an attempt to design a product that would avoid a certain classification or rate of duty—although, in any event, that would not affect the merits of the case. The history of the shoe provision has been recounted in order to show what persuaded the court that there was an inclusive intent to the provision for "foxing or foxing-like bands." That intentional inclusiveness reinforces the general rule that the terms used in tariff law extend even to advanced varieties of products that may not have been in production at the time the statutory phrase was written. *United States v. Standard Surplus Sales,* 667 F.2d 1011, 69 C.C.P.A. 34, 38 (1981); *Lanston Industries, Inc. v. United States,* 49 C.C.P.A. 123, 127, C.A.D. 807, 1962 WL 9327 (1962)

[3] Plaintiffs also seek to rely on guidelines issued by Customs in 1983 for the general guidance of Customs Officers in classifying footwear with "foxing" or "foxing-like bands." *T.D. 83–116.* T.D. 83–116 included seven guidelines for analysis of whether footwear contained a foxing-like band. It would be pointless to get into the question of whether those guidelines define the terms at issue in a way that should redound to the benefit of plaintiffs' claim in the present case for the simple reason that such guidelines cannot be inconsistent with, and cannot countermand, legislative intent. *See, e.g., Central Soya, Inc. v. United States,* 15 CIT 105, 761 F.Supp. 133 (1991), *aff'd,* 953 F.2d 630 (Fed. Cir.1992). In any event, if it came to analysis of those guidelines the court would, in all likelihood, read them as not ruling out the application of the foxing terminology to the present importations.

In the same vein, it is immaterial whether or not the plaintiffs received an informal opinion from an import specialist in Portland, Oregon that advance samples of these importations did not have "foxing-like bands". Such opinions do not bind the Customs Service. The way to obtain a binding ruling on a prospective transaction is to ask for a binding ruling to be issued pursuant to 19 C.F.R. § 177.1. Failing that, none of plaintiffs' attempts to rely on meetings or conversations with Customs personnel have any bearing on the legal question before the court.

Finally, there is nothing in the case law to support a limited view of the scope of the term "foxing-like band" or to alter the court's perception of the legislative intent. In *Far Eastern Dep't Store U.S.A.—Inc. v. United States,* 11 CIT 932, 678 F.Supp. 892 (1987), *aff'd per curiam,* 852 F.2d 1286 (Fed.Cir. 1988), the application of "foxing" language to athletic footwear was taken for granted. In that case the court decided that neither the "invisibility" of the foxing in question nor the

fact that it was applied to footwear that did not have the appearance of a "sneaker" or "tennis shoe" could avoid its effect on the classification of a slip-on shoe with a cotton upper and a rubber sole.

In *Pagoda Trading Co. v. United States*, 6 CIT 296, 577 F.Supp. 22 (1983), although the aforementioned T.D. 83–116 was involved, this court said nothing to suggest what it meant with respect to foxing or to imply in any way that it was the final word on the subject of foxing or foxing-like bands. That decision merely held that the court could not presume that the guidelines would be applied to future importations and that it was premature for an importer to bring an action regarding indeterminate future importations based on that assumption. That issue was purely jurisdictional and provides no guidance for the issue herein.

For the reasons given above the court concludes that the government was correct to treat these importations as having a "foxing-like band". None of the arguments advanced by plaintiffs have overcome the demonstration that it was the legislative intention that the term "foxing-like band" would describe the material that encircles these importations.

Judgment will enter accordingly.

### JUDGMENT

**THAT** Defendant's motion for summary judgment be, and the same hereby is, GRANTED.