**UNITED STATES COURT OF INTERNATIONAL TRADE**
**JAMES L. WATSON, SENIOR JUDGE**

| | |
|---|---|
| **GENESCO INC.,** | : |
| **Plaintiff,** | : |
| **v.** | : |
| **UNITED STATES,** | : |
| **Defendant.** | : |

**Court No. 92-02-00084**

[Judgment for defendant on stipulated facts in lieu of trial.]

Ross & Hardies (John B. Pellegrini) for plaintiff.

David W. Ogden, Acting Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Barbara M. Epstein, Esq.), for United States.

Decided: May 23, 2000

**WATSON, SENIOR JUDGE:**

## INTRODUCTION

In this action, the court revisits the hotly contested and somewhat esoteric issue of whether imported footwear has a "foxing-like band," and consequently, subject to a higher rate of duty than would otherwise be assessed on the footwear. Currently before the court is plaintiff's challenge to the classification by the United States Customs Service ("Customs") of six styles of men's and boy's athletic shoes imported by plaintiff that Customs determined have a "foxing-like band." The court's jurisdiction is predicated on 28 U.S.C. § 1581(a).

Upon liquidation of the entries, Customs classified plaintiff's merchandise under the provisions

for footwear with outer soles and uppers of rubber or plastics under subheadings 6402.19.50, 6402.19.70, or 6402.99.80 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Plaintiff claims that the subject footwear is properly dutiable under the HTSUS subheadings 6402.19.10 or 6402.99.15 (depending on the model) for footwear with outer soles and uppers of rubber or plastics, which subheadings except footwear having a "foxing-like band applied or molded at the sole and overlapping the upper." Hence, the parties agree that the footwear at issue is properly classifiable under Heading 6402, HTSUS, and the issues in this case revolve around whether plaintiff's footwear has a "foxing-like band" within the meaning of the exception under the subheadings claimed by plaintiff.

### STIPULATED FACTS

The parties seek judgment on the basis of the following stipulated facts in lieu of trial, pursuant to the court's order of June 29, 1999, which stipulation references as an exhibit a half-pair of the imports.[1]

The subject footwear comprises six different styles of men's and boy's athletic footwear with rubber/plastic uppers and outer soles. The sole of the footwear consists of an outer sole and mid-sole cemented together. The outer sole overlaps the upper by more than 1/4 inch in the toe area extending toward the back of the shoe (approximately 1/4 of the length of the shoe) where the ball of the foot would be located. The area overlapped by the sole covers approximately 37.5 percent of the perimeter of the shoe upper. The mid-sole of the shoes begins just forward of the instep and extends to the rear

---

[1] Also, the briefs of the parties make reference to numerous appended documentary exhibits.

of the shoe and does not overlap the upper. The imported shoes have a separate rubber/plastic piece in the rear or heel area, known as a "heel stabilizer," which is separately cemented to the mid-sole and overlaps the upper by more than 1/4 inch. The heel stabilizer feature alone covers approximately 23.1 percent of the perimeter of the shoe. The combined areas of overlap of the outer sole and heel stabilizer cover slightly less than 65 percent of the perimeter of the shoe.

## PARTIES' CONTENTIONS

Citing Customs' ruling in T.D. 83-116, 17 Cust. Bull. 229 (1983), at 248, which, inter alia, sets forth the characteristics of a "foxing-like band," plaintiff agrees that a "foxing-like band" must resemble the foxing of traditional sneakers and tennis shoes and must encircle or substantially encircle the perimeter of the shoe. Plaintiff argues that in the subject footwear the combination of the outer sole and separate heel stabilizer that overlap the upper does not "substantially encircle" the footwear or have the "visual impact" of the foxing of traditional sneakers and tennis shoes. Plaintiff also posits that the overlap of the upper by the outer sole should not be counted as part of a "foxing-like band," and the heel stabilizer (which encircles only 23.1 percent of the perimeter of the shoe) alone does not constitute a "foxing-like band." Defendant agrees that, as reflected in Customs rulings T.D. 83-116 and also a later ruling, T.D. 92-108, a "foxing-like band" must resemble the foxing of the traditional sneaker or tennis shoe and must encircle or substantially encircle the perimeter of the footwear. However, seeking judicial deference to T.D. 92-108 and Customs' so-called "40-60" rule, which is used to determine whether footwear is "substantially encircled," defendant contends that the combination of the overlap of the upper by the sole and heel stabilizer encircles nearly 65 percent of the perimeter of the shoe, and therefore, "substantially encircles" the shoe. Defendant argues that the court should defer to T.D. 92-

108, because unlike ordinary Customs rulings, T.D. 92-108 was issued after notice-and-comment

procedures.  Finally, defendant argues there is no support in the statute or its legislative history that an

outer sole which overlaps the upper should not be included in the term "foxing-like band."

## THE ISSUES

The issues are: (1) whether the alleged foxing-like band found by Customs in the subject

footwear "substantially encircles" the perimeter of the shoes; and in making that determination,  whether

the court may properly defer to Customs' ruling T.D. 92-108; (2) whether an overlap of the upper by

the outer sole should be counted in determining whether an alleged  "foxing-like band" substantially

encircles the perimeter of the shoe; and (3) whether the gaps in the overlap of the upper between the

toe and heel on both sides the shoe preclude a "foxing-like band."

## DISCUSSION

## 1.

## The Nike Decision

The meaning of the terms "foxing" and  "foxing-like band" as used in the footwear subheadings

of the HTSUS is, of course, a question of law.  Both parties call attention to Nissho Iwai American

Corp. and Nike, Inc. v. United States, 143 F. 3d 1470 (Fed. Cir. 1998), aff'g,  967 F. Supp. 517

(CIT 1997) ("Nike"), in which the Federal Circuit interpreted the statutory terms "foxing" and  "foxing-

like band." The Federal Circuit described "foxing" as "a band of material, such as rubber, applied to

the shoe or boot, as in a Converse All Star®, that overlaps and bonds the sole to the upper." 143 F.3d

at 1471-72. As in Nike, in the current case it is undisputed that the subject footwear does not have

"foxing."  Rather  Customs posits that the footwear has "foxing-like bands," and therefore, falls within

the exception in the subheadings claimed by Genesco.

Further, in Nike the court found that, unlike the term "foxing," the term "foxing-like" has no statutory definition, no common meaning, no commercial understanding or designation, and no relevant industry practice on which to rely. Nike, 143 F.3d at 1472. Finding the term ambiguous, the appellate court resorted to the Tariff Classification Study, Explanatory and Background Materials, Schedule 7 (Nov. 15, 1960) ("TCS") and Customs' ruling in T.D. 83-116. Nike, 143 F. 3d at 1472, 1474. From the foregoing, the Federal Circuit concluded that this court "did not err in interpreting the tariff term 'foxing-like band' as applying to athletic shoes having an externally visible band applied or molded at the sole and overlapping the upper, whether or not those shoes are constructed with a mid-sole." 143 F. 3d at 1471.

The Federal Circuit went on to observe that the legislative history of the TSUS indicates the term "foxing-like band" was intended to apply to the broad range of rubber-soled footwear manufactured by the domestic industry, i.e., "sneakers, tennis shoes, basketball shoes, and similar footwear having a visible band formed by the sole overlapping the upper, i.e., having a resemblance to the foxing of the traditional sneaker or tennis shoe." Id. 143 F.3d at 1474 ("if the athletic footwear has a visible band formed by the sole overlapping the upper (such that it resembles the traditional sneaker or tennis shoe), it falls within the exclusion.").

Nike's analysis of the legislative history as to the Congressional intent underlying the "foxing-like band" exception is helpful here, but Nike did not present the issues raised by plaintiff in the current case, as outlined above.

**2.**

**Customs' Rulings**

For support of its position that a "foxing-like band" must encircle or substantially encircle the perimeter of the shoe, plaintiff heavily relies on Customs ruling T.D. 83-116, which was also referred to by the Federal Circuit in Nike. There is no dispute in this case that a foxing-like band must encircle or substantially encircle the perimeter of the shoe, but the parties sharply disagree as to whether the subject footwear possesses that characteristic.

Defendant insists that the alleged foxing-like band, which encircles nearly 65 percent of the perimeter of the shoe, "substantially encircles" the subject shoes, citing Customs ruling T.D. 92-108, issued after notice-and-comment procedures. That ruling makes clear that even though the TSUS was superceded by the HTSUS, effective January 1. 1989, the guidelines of T.D. 83-116 are still followed by Customs with regard to the classification of footwear under the HTSUS. 26 Customs Bulletin 362, at 363 (1992).

The so-called "40-60" rule outlined in, and continued by, T.D. 92-108, 26 Cust. Bull., at 364, is a measurement used by Customs import specialists to assist them in making a determination pertaining to the issue of whether there is a "substantial" encirclement within the purview of T.D. 83-116 and T.D. 92-108. Generally, under the "40-60" rule, an encirclement of less than 40 percent of the perimeter of the shoe by the band does not constitute a "substantial" encirclement, and thus indicates there is no foxing or a foxing-like band. Encirclements of between 40 and 60 percent of the perimeter of the shoe by the band may or may not constitute a foxing or a foxing-like band depending on whether the band functions or looks like a foxing according to certain criteria. Encirclement exceeding 60

percent of the perimeter of the shoe by the band, as in the current case,  is always considered "substantial encirclement."

Among many of the great difficulties presented by the statutory term "foxing-like band" is that according to Customs' interpretation and rulings (T.D. 83-116 is undisputed by plaintiff), it must encircle or  "substantially" encircle" the shoe, but there has been great controversy concerning what percentage of encirclement is "substantial."  The term "substantially encircles," however, was entirely  a creature of the 1983 ruling, as nothing in the statute, its legislative history, or any common or trade meaning of "foxing" or "foxing like band" refers to such characteristic. The term "substantially" when used as a quantitative  modifier of "encircle," is very imprecise, has many nuances, and is itself  a rather broad term requiring interpretation in specific cases. Nonetheless, in T.D. 83-116 Customs entirely refrained from quantifying the amount of encirclement that would be considered as "substantial," presumably leaving the issue to be decided on a case by case basis taking all relevant factors into consideration. However,  as indicated in T.D. 92-108, the footwear importers stated that is imperative that they have an objective standard to rely on in order to accurately determine pricing, and in connection with the 1992 ruling proffered to Customs various definitions of "substantial encirclement."

Prior to issuance of  T.D. 92-108,  footwear importers as well as the domestic footwear manufacturers had urged Customs to change its "40-60" practice and proposed various other percentages of encirclement qualifying as "substantial," i.e., 30-50 percent, 51 percent, and  60 or 75 percent. See "26 Cust. Bull. at 364-65.  However, after thorough consideration of numerous comments from the public,  various definitions and proposed percentages by the domestic footwear and importing communities, Customs decided in T.D. 92-108,  that it would continue to implement the term

"substantially encircle" for foxing-like bands in accordance with its "40-60" rule, assuring uniformity in the implementation of the term "substantially encircle" at the various ports. See 26 Cust. Bull. at 368. The decision of Customs that plaintiff's footwear has a foxing-like band that "substantially encircles" the shoe was thus made pursuant to Customs' rulings in T.D. 83-116, T.D. 92-108, and the "40-60" rule.

### 3.

### Chevron Deference to Customs Rulings

The court now turns to defendant's contention that T.D. 92-108, which was published after notice-and-comment procedures, should be accorded deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984) ("Chevron"). Plaintiff agrees with the characteristics of a foxing-like band as set forth in T.D. 83-116 and T.D. 92-108, and concedes that Chevron deference to notice-and-comment rulings is an "open question." Pltf's Reply Br. at 2. We first address whether under the facts and circumstances of this case, and judicial authority, the court may properly defer to an interpretive Customs ruling, like T.D. 92-108, issued after notice-and-comment procedures.

### A.

### The Mead Decision.

In Mead Corp. v. United States, 185 F.3d 1304 (Fed. Cir. 1999), the Federal Circuit stressed that, unlike ordinary rulings, regulations issued by Customs are subject to the procedural rigors dictated by the Administrative Procedure Act, see 5 U.S.C. § 553 (1994), therefore must first undergo notice-and-comment procedures, see 5 U.S.C. § 553(c), and are subject to other procedural

safeguards, see 5 U.S.C. § 553(e). Citing Haggar v. United States, 119 S. Ct. 1392 (1999), which accorded a Customs interpretive regulation Chevron deference, Mead points up that a regulation represents a reasoned and informed articulation of Customs' statutory interpretation, which serves to "clarify the rights and obligations of importers." 185 F. 3d at 1307.

Mead holds that Haggar's reach (and thus Chevron deference) does not extend to "ordinary" or "typical" Customs rulings, see 19 C.F.R. § 177.0, 177.1(a) (1998), which do not involve such procedural safeguards as public debate or discussion, are confined to specific facts and parties to a particular transaction at issue, and unlike regulations, are not intended to clarify the rights and obligations of importers beyond the specific matter under review. See 19 C.F.R. § 177.1(d)(1). However, Mead expressly reserved decision as to whether Chevron deference applies to "[c]ertain rulings- - specifically those which have the 'effect of changing a practice'- - undergo notice-and-comment procedures, 19 C.F.R. § 177.10(c) (1998)." 185 F.3d at 1307, n.1.

In T.D. 92-108, Customs stated that since a change in the interpretation of "substantially encircle" would affect the duty charged to imported footwear, comments from the domestic manufacturers as well as the footwear importing community were requested by notice published in the Customs Bulletin on June 3, 1992. Customs also stated in T.D. 92-108 that the comments received were carefully considered prior to determining that the existing interpretation of "substantially encircle" under the so-called "40-60" rule need not be changed. Id., 26 Cust. Bull. at 262.

Accordingly, unlike the ordinary ruling in Mead, which was not accorded Chevron deference, T.D. 92-108 was issued after notice-and-comment procedures, published in the Customs Bulletin, is not limited to the facts of a particular case or to certain parties, was a sequel to and interpretive of a

prior long-standing and consistently followed notice-and-comment ruling, T.D. 83-116 (which was relied on Nike), and continued the uniform application of the "40-60" rule interpreting "substantially encircled" as that term is used in T.D. 83-116.

In sum, although T.D. 92-108 is clearly an authoritative articulation of Customs' interpretation of the statutory term "foxing-like band," and the term "substantially encircle," it is nonetheless a ruling, albeit issued after notice-and-comment procedures, but is not a regulation. Therefore, Mead does not tell us how much, if any, deference this court should  accord  to a notice-and-comment interpretive ruling, but expressly leaves that matter open.

**B.**

**The Supreme Court's Recent Christensen Decision**

Recently, in Christensen v. Harris County, 2000 U.S. Lexis 3003 (U.S. Supreme Court May 1, 2000), a Supreme Court majority opinion (Justice Thomas writing for the majority, joined by Rehnquist, C.J., and Justices O'Connor, Kennedy, and Souter) held that unlike an interpretive regulation construing an ambiguous statute, Chevron deference does  not apply to an "opinion letter" issued by the Acting Administrator of the United States Department of Labor's Wage and Hour Division ("Labor"), because Labor's interpretation of the statute at issue was "not one arrived at after, for example, a formal adjudication or notice-and-comment rule-making."  While rejecting Chevron deference for policy statements, interpretive rules, agency manuals, and enforcement guidelines lacking the force of law,  the Christensen majority opinion recognizes that instead of Chevron- style deference, interpretations contained in formats such as opinion letters are "entitled to respect," but only to the extent that they are persuasive, citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) and EEOC

v. Arabian American Oil Co., 499 U.S. 244, at 256-58 (1991). The Christensen majority found that Labor's opinion letter was not persuasive as to the correct interpretation of the statute.

Justice Scalia concurred in the judgment and wrote a  separate concurring (in part) opinion, in which he disagreed with the majority view that Labor's opinion letter was entitled to no more than "Skidmore deference," citing cases showing that the Court had accorded Chevron deference not only to agency regulations, but also to "authoritative agency positions set forth in a variety of other formats." Accordingly, Scalia held that Labor's opinion letter warranted Chevron deference, "if it represents the authoritative view of the Department of Labor."  However, Scalia agreed with the majority's interpretation of the statute at issue, and  rejected  Labor's interpretation of the statute as set forth in the opinion letter.

Dissenting opinions by Justices Stevens (joined by Justices Ginsburg and Breyer) and by Justice Breyer (joined by Justice Ginsburg) agreed with the majority view that under Skidmore,  an authoritative agency interpretation, thoroughly considered and consistently observed, "unquestionably merits our respect," and may well warrant Chevron deference. As observed by Justice Breyer: "Skidmore made clear that courts may pay particular attention to the views of an expert agency where they represent 'specialized experience,' 323 U.S. at 139, even if they do not constitute an exercise of delegated lawmaking authority." Continuing, Breyer noted, "The [Supreme] Court held that the rulings, interpretations and opinions of an agency, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."

In Christensen, Labor's interpretive opinion letter was not a notice-and-comment ruling, and

none of the opinions in this case specifically addressed that type of ruling. Nonetheless, the Christensen

majority opinion, the concurring (in part) opinion of Justice Scalia, and the views of the dissenting

justices Stevens, Breyer and Justice Ginsburg, all strongly suggest that interpretive rulings issued after

notice-and-comment procedures, merit at the least the respect of the court, if not Chevron deference.

Consequently, this court shall will be guided by T.D. 92-108 and the "40-

60" rule to the extent that they apply under the facts of this case, and are a reasonable application of

"substantially encircle.

## C.
### Reasonableness of the "40-60" rule as to the Encirclement in this Case.

The statute requires only that a foxing-like band be applied or molded at the sole and

overlap the upper, and there is no reference to the extent of the encirclement of the perimeter of the

shoe. Additionally, there is nothing in the legislative history that would require that a "foxing-like band"

completely, or even substantially, encircle the shoe, [2] or have no gaps (see discussion infra concerning

gaps).The parties agree that, as stated in Customs rulings, a "foxing-like band" must either encircle or

"substantially" encircle the shoe. Under T.D. 92-108 and the "40-60" rule, an encirclement of slightly

less than 65 percent would be regarded by Customs as  "substantially encircle" under T.D. 83-116

and T.D. 92-108.  Plaintiff, however,  contends that such percentage is unreasonably low to be

---

[2] In T.D. 92-108, there appears to be an inconsistency in the language "encircle or substantially encircle the entire shoe." Since "substantially encircle" allows for something less than encirclement of the entire perimeter of the shoe, a fortiori a foxing-like band cannot "substantially" encircle the "entire" perimeter of the shoe. Hence, the court reads Customs' rulings to mean that a foxing-like band must either encircle the entire shoe or substantially encircle the shoe, but not "substantially" encircle the "entire" shoe.

"substantial" and unsupported by judicial authority.

In T.D. 92-108, after notice-and-comment procedures and  much skirmishing between the domestic manufacturers of footwear and footwear importers over percentages of encirclement, the agency decided that its "40-60" guideline for interpreting "substantially encircled" should be continued. Given the imperatives of specifically quantifying the extent of encirclement of a "foxing-like band," and the term "substantially" itself for purposes of Customs' rulings as to the characteristics of  a "foxing-like" band, it makes eminent sense to accord, if not Chevron deference, at least Skidmore respect, to T.D. 92-108 and the "40-60" rule to the extent they apply under the facts of this case and  are reasonable.  This approach accords with that of the Federal Circuit in  Nike, where in addition to the Tariff Classification Study, the appellate court buttressed its conclusions with references to T.D. 83-116, which was also issued after notice-and-comment procedures, and is  continued under T.D. 92-108.

The parties have stipulated that in plaintiff's footwear there is an encirclement of slightly less than 65 percent of the perimeter of the upper by the combination of the overlapping sole and heel stabilizer, which percentage plaintiff maintains is insufficient encirclement to qualify as "substantially encircle" under T.D. 83-116.  To reiterate, under the "40-60" rule continued under T.D. 92-108 Customs' position is that  an encirclement exceeding 60 percent of the perimeter of the shoe is "substantial encirclement." See 26 Cust. Bull. at 364 (encirclement exceeding 60 percent is "substantial encirclement"). The issue of the reasonableness of Customs' interpretation  of "substantially encircle" under T.D. 92-108, while a question of law,  must  be adjudicated  in the context of the factual situation

before the court, and not adjudicated on hypothetical percentages or  facts.[3] For the following reasons

the court holds that as applied to the stipulated facts of the current case, in which there is a nearly 65

percent encirclement, the court holds that such percentage of encirclement is sufficient to constitute a

"substantial" encirclement for purposes of the term "foxing-like band."

In T.D. 92-108, Customs notes: "[n]one of the definitions [submitted to Customs] actually

quantify 'substantial.' It is always expressed in other terms which clearly convey the meaning. Certainly,

a 40% encirclement is a substantial encirclement of the perimeter of the shoe in that it conforms exactly

to the dictionary definitions of 'substantial' by being ample, considerable in quantity, significantly large

and largely, but not wholly that which is specified." 26 Cust. Bull. at 366.  When the term

"substantially" is used as an adverb preceding a verb, the term means "in a substantial manner: so as to

be substantial." Webster's Third New International Dictionary of the English Language Unabridged

(1968).

Plaintiff, however, posits on the basis of certain judicial authorities that a "substantial"

encirclement requires at least 70 percent encirclement. Plt'fs Br. at 4, 10, 15, and 21. Plaintiff submits

admittedly "not perfect" references to California judicial decisions construing the term "substantially

---

[3] While the situation is not before the court, in any event there is no dispute that an encirclement of less than 40 percent does not constitute "substantial encirclement." Also, while the situation is not before the court, as to the range of 40-60 percent encirclement, it is significant that Customs looks to additional criteria and facts to determine whether a band  functions or looks like a foxing. Since the parties have stipulated in this case that encirclement exceeds the  60 percent threshold , which Customs regards as "substantially encircle" in all cases, the issue of the reasonableness of percentages of encirclement within the 40-60 percent range is not presented for decision in this case, and the court declines to address such other percentages not before the court in this case in merely dictum. However, no inference should be drawn from anything stated in this opinion as to the "40-60" rule with respect to percentages of encirclement less than that involved here.

surrounded" for purposes of  annexation of unincorporated property, and certain Customs' decisions

addressing the "substantially complete" test for an unfinished article, i.e., at least 77 percent of the costs

of the complete article. The court has also considered the term "substantial" and "substantially" as

addressed by courts and federal agencies in other unrelated contexts, as proffered by both parties.

Extended discussion of such decisions is deemed unnecessary as the court has concluded that

application of the terms in those cases, resulting in a range of percentages (ones as low as 16 and 25

and as high as 89), was context dependent and are not relevant to whether slightly less than 65 percent

encirclement  reasonably defines whether a shoe is "substantially" encircled by the alleged foxing-like

band.

## 4.

### Plaintiff's "Visual Impact" Argument

Plaintiff's  further contends that the gaps in the overlap of the upper by the sole and heel

stabilizer between the toe and heel on both sides of the shoe prevent  the requisite  "visual impact" of

the foxing of the traditional sneaker or tennis shoe - - in which the foxing completely encircles the

perimeter of the shoe, without gaps- - and, therefore, the subject footwear has  no foxing-like band.

The court disagrees. In Nike, the Federal Circuit held that "foxing-like" refers to a band overlapping the

upper that is similar to or resembles the foxing found on a traditional sneaker or tennis shoe, i.e.,  a

"visible band formed by the sole and overlapping the upper." Nike, 143 F. 3d at 1474. However, gaps

in a "foxing-like" band are permissible provided that the band still substantially encircles the perimeter

of the shoe. Plaintiff's contention that the gaps in the subject footwear preclude the visual impact of

foxing is simply an extension of plaintiff's  argument that the overlapping sole and heel stabilizer do not

substantially encircle the shoe, which the court rejects.

**5.**

**<u>Exclusion of  Soles That Overlap the Upper From a Foxing-like Band</u>**

Finally,  plaintiff argues that the "foxing-like" band exception does not apply to soles which overlap the upper. Plaintiff notes that in HTSUS subheading 6404.19.40 (which is not involved in this case) there are two exceptions: one exception for footwear having a foxing or foxing-like band applied to or molded at the sole and overlapping the upper, and an additional and separate exception for footwear with soles which overlap the upper.  Plaintiff insists that the two exceptions must be construed as mutually exclusive since if the foxing-like band exception includes soles which overlap the upper, the second exception for footwear with soles that overlap the upper would be rendered superfluous. Thus, plaintiff urges the court to exclude the overlapping outer sole of the subject footwear, leaving only the heel stabilizer covering approximately 23.1 percent of the perimeter of the subject shoes, which is not "substantial encirclement." <u>Pltf's Br.</u> at 18. Defendant argues that the legislative history of the second exception, which covers footwear with soles overlapping the upper <u>other than at the toe or heel</u>  shows that Congress intended only to cover a particular form of footwear known as a  "jogger," and that the first exception for a "foxing-like band" may include soles which overlap the upper. In <u>Nike</u>, it was undisputed  that the overlap of the outer sole was "foxing-like."143 F. 3d at 1472. Moreover, the legislative history addressed in <u>Nike</u> clearly shows that a visible band formed by the sole overlapping the upper falls within the foxing-like band exception. <u>Id.</u> at 1474.

In short, plaintiff's construction of the term "foxing-like band" to exclude soles overlapping the upper must be rejected as contrary to express language of the statute and relevant legislative history.

## CONCLUSION

Judgment dismissing the action is entered accordingly.

Dated: New York, New York
    May 23, 2000

                                  James L. Watson, Senior Judge

**ERRATA**

Slip Op. 00-57

<u>GENESCO INC. V. UNITED STATES</u>

Court No. 92-02-00084

On the first page, amend the Government's appearances following (<u>Barbara M. Epstein</u>, Esq.). Delete: ",for United States." Add: "; <u>Chi S. Choy</u>, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of Counsel, for defendant."

On page 6, second paragraph, fourth line: amend " January 1. 1989" to read "January 1, 1989."

On page 11, last paragraph, second line: amend "in this case" to read "in that case"; amend "addressed" to read "address."

On page 12, first paragraph, third line, delete the word "shall"; in second paragraph, line 5, amend "Customs" to read "Customs' "

On page 13, first paragraph, seventh line: amend "Tariff Classification Study" to read "<u>Tariff Classification Study</u>"

Page 15, first paragraph, fourth line: following the word s "dependent and" add "those cases"; in second paragraph, first line: amend "Plaintiff's" to read "Plaintiff"