**Slip Op. 01-**28

## United States Court of International Trade

<table>
<tr><td>

3G MERMET FABRIC Corp.,

              Plaintiff,

     v.

UNITED STATES,

              Defendant.

</td><td>

Before: Pogue, Judge

Court No. 98-04-00669

</td></tr>
</table>

[Judgment entered for Plaintiff.]

Decided: March 13, 2001

DeKieffer & Horgan (J. Kevin Horgan) for Plaintiffs.

Stuart E. Schiffer, Acting Assistant Attorney General, Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Bruce N. Stratvert, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, for Defendant.

### OPINION

**Pogue, Judge:** This case is before the court after trial de novo. At issue is the proper tariff classification under 19 U.S.C. § 1202 (1988), Harmonized Tariff Schedule of the United States ("HTSUS"), of 3G Mermet's ("Plaintiff") imported window shade fabrics. The court has jurisdiction pursuant to 28 U.S.C. § 1581(a)(1994).

### Background

In 1997, Plaintiff imported several varieties of window shade

fabrics: Satiné 5500, Natté 4500, E Screen 4100, Flocké 11201,[1] Paradis 11600, and Auris 11190.  The United States Customs Service ("Customs"), upon liquidation, classified the window shade fabrics as articles of glass fibers under subheadings 7019.59.40, HTSUS, and 7019.59.90, HTSUS, thereby assessing a duty of 8 % and 9.9 % ad valorem, respectively.[2]  Plaintiff claims the merchandise should have been uniformly classified under subheading 3926.90.9890, HTSUS, as "Other articles of plastics and articles of other materials of headings 3901 to 3914: Other: Other . . . Other," with

---

[1]After the completion of trial, Customs, by motion, attempted to enter into evidence a lab report on the composition of the fabric Flocké.  This motion is now moot, as the parties have agreed to remand the Flocké fabric to Customs.  As a result, this opinion does not apply to the classification of Flocké.

[2]Subheading 7019.59.40, HTSUS, in relevant part provides:

| 7019 | Glass fibers (including glass wool) and articles thereof (for example, yarn, woven fabrics): |
|------|------|
| * * * | |
| 7019.59 | Other: Not colored: |
| * * * | |
| 7019.59.40 | Other |

Subheading 7019.59.90, HTSUS, provides:

| 7019 | Glass fibers (including glass wool) and articles thereof (for example, yarn, woven fabrics): |
|------|------|
| * * * | |
| 7019.59 | Other: Colored: |
| * * * | |
| 7019.59.90 | Other |

a duty rate of 5.3 % <u>ad</u> <u>valorem</u>.[3]

The General Rules of Interpretation ("GRI") of the HTSUS govern the proper classification of merchandise. <u>See</u> <u>Orlando Food Corp. v. United States</u>, 140 F.3d 1437, 1439 (Fed. Cir. 1998). Classification involves a two-step process. The court is required to: "(1) ascertain[] . . . the proper meaning of specific terms in the tariff provision; and (2) determine[] . . . whether the merchandise at issue comes within the description of such terms as properly construed." <u>Sports Graphics, Inc. v. United States</u>, 24 F.3d 1390, 1391 (Fed. Cir. 1994).

Customs and Plaintiff agree that the fabrics are composite goods, prima facie classifiable in both chapter 39, as articles of plastic, and chapter 70, as articles of glass fibers. <u>See</u> Revised Pretrial Order, Schedule C, at ¶ 6. Each chapter refers to only one of the materials used to produce the fabrics; as a result, the parties agree that the analysis should not proceed under GRI 1 or 3(a). Rather, the parties debate whether the analysis should be in accordance with GRI 3(b) or (c).[4] GRI 3(b) allows composite goods,

---

[3]The materials listed in headings 3901 to 3914, referred to in subheading 3926.90.9890, HTSUS, include the plastic material used in producing the window shade fabrics at issue.

[4]General Rule of Interpretation 1 provides for classification "according to the terms of the headings and any relative section or chapter notes . . . ." GRI 1, HTSUS.

GRI 3 provides:

When, by application of rule 2(b) or for any other

3

not classifiable in accordance with GRI 3(a), to be classified as if consisting of the material giving the good its essential character. See GRI 3(b), HTSUS. Plaintiff argues that the window shade fabrics are essentially articles of plastic, and should be classified in chapter 39 pursuant to GRI 3(b). See Revised Pretrial Order, Schedule C-1, at ¶ 1, Schedule D-1, at ¶ 1. Customs, on the other hand, believes the goods should be classified in accordance with GRI 3(c), which allows classification under the heading occurring last in numerical order among those of equal merit.[5] See id. at Schedule C-2, at ¶ 3, Schedule D-2.

---

reason, goods are, prima facie, classifiable under two or more headings, classification shall be effected as follows:

(a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

(b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

(c) When goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

[5]Customs also argues that the classification of the window shade fabrics in chapter 70 is in accordance with longstanding administrative practice. See HQ 960345 (June 13, 1997), HQ

The parties' analyses, however, do not adequately reflect the direction of the Explanatory Notes for chapter 39. See Harmonized Commodity Description and Coding System, Explanatory Notes (2nd ed. 1996)("Explanatory Notes"), at 598.[6] These notes clarify the chapter heading by defining what constitutes an article of plastic, and apply to "combinations of plastics and materials other than

---

084721 (Aug. 24, 1989), and NY 837567 (March 9, 1989). In Mead Corp. v. United States, 185 F.3d 1304 (Fed. Cir. 1999), cert. granted, 120 S.Ct. 2193 (2000), the Federal Circuit held that Chevron deference does not extend to "ordinary" or "typical" Customs rulings. These rulings "do not involve such procedural safeguards as public debate or discussion, are confined to specific facts and parties to a particular transaction at issue, and unlike regulations, are not intended to clarify the rights and obligations of importers beyond the specific matter under review." Genesco Inc. v. United States, 24 CIT __, __, 102 F. Supp. 2d 478, 482 (2000). Rather, Customs rulings should be "'entitled to respect,' but only to the extent that they are persuasive." Id. at __, 102 F. Supp. 2d at 483. Whether this court may be required to accord a higher degree of deference may depend on the Supreme Court's decision in Mead.

In any event, the rulings referred to by Customs here are irrelevant. The rulings discuss the importance of the fiberglass in maintaining strength, durability and resistance to bacteria and tear. At trial, however, these characteristics were not proven to be either crucial to or primarily dependent on the fiberglass. Although the fiberglass does help to strengthen the window shade fabric, it is through a reinforcing and supporting function not addressed by the Customs rulings. Accordingly, the Customs rulings are based on inapplicable factual findings. Therefore, even were Mead to be reversed, the holding here would not be affected.

[6]While the Explanatory Notes "do not constitute controlling legislative history," Lonza, Inc. v. United States, 46 F.3d 1098, 1109 (Fed. Cir. 1995), they are instructive, offering "guidance in interpreting HTS[US] subheadings." Id. The Explanatory Notes are especially persuasive "when they specifically include or exclude an item from a tariff heading." H.I.M./Fathom, Inc. v. United States, 21 CIT 776, 779, 981 F. Supp. 610, 613 (1997).

textiles."[7] Id.  If a good retains the essential character of an article of plastic and fits within one of the subsections (a) through (d), the good is classifiable under chapter 39 as an article of plastic in accordance with GRI 1.  See Orlando Food Corp., 140 F.3d at 1440 ("According to GRI 1, the HTSUS headings, as well as relative section or chapter notes, govern the classification of a product.").  Thus, the issue for trial was whether the window shade fabrics retain the essential character of articles of plastic and meet the requirements of one of the subsections (a) through (d) of the General Explanatory Notes to chapter 39.[8]

_____

[7]The General Explanatory Notes to chapter 39 read, in pertinent part:

> This Chapter also covers the following products, whether they have been obtained by a single operation or by a number of successive operations provided that they retain the essential character of articles of plastics:
> (a) Plates, sheets, etc., incorporating a reinforcement or a supporting mesh of another material (wire, glass fibres, etc.) embedded in the body of the plastics.
> * * *
> (d) Products consisting of glass fibres or sheets of paper, impregnated with plastics and compressed together, provided they have a hard, rigid character.
> * * *
> The provisions of the preceding paragraph also apply, mutatis mutandis, to monofilaments, rods, sticks, profile shapes, tubes, pipes and hoses and articles.

 Explanatory Notes, at 598.

[8]Pursuant to 28 U.S.C. § 2639 (a)(1)(1994), Customs' factual determinations are presumed correct.  See e.g., Salant Corp. v.

## Findings of Fact

The window shade fabrics at issue are used to produce exterior and interior roller shades, vertical blinds and vellum blinds. See Revised Pretrial Order, Schedule C, at ¶ 5. The fabrics are made in France by Plaintiff's parent company and then imported into the United States. See id. at ¶ 1. Once the fabrics are in the United States, Plaintiff sells them to window covering manufacturers, who cut the fabric to dimension and "put it on the hardware to the specification of the marketplace." Trial Transcript, at 8.

### A. Production Process

The materials are produced by one of two processes. See Revised Pretrial Order, Schedule C, at ¶ 4. Three variations of the window shade fabric, Satiné 5500, Natté 4500, and E Screen 4100, are woven from strands of yarn that are produced by coating colorless glass fibers with variously colored PVC plastic prior to weaving. See id. These window shade fabrics are made by taking a fiberglass core and passing it through several PVC coatings. See Trial Transcript, at 6. The individual PVC coated fiberglass yarns

United States, 24 CIT __, __, 86 F. Supp. 2d 1301, 1303 (2000); Cf. Universal Elecs. Inc. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997)(holding that "although the presumption of correctness applies to the ultimate classification decision . . . the presumption caries no force as to questions of law"). To overcome the presumption, the party challenging the classification has the burden of proof and must produce a preponderance of evidence on the disputed factual question. See Universal Elecs. Inc., 112 F.3d at 492.

are then woven together.  See id.  After the weaving process, the
coated yarns are heated through a "tenturing" process.[9]  The heat
allows the coating of intersecting yarns to adhere to each other,
giving the fabric some stability.  The difference between the
fabrics, such as Satinè and Nattè, is due to the size of the
monofilaments and the pattern resulting from the weaving
structure.[10]  See Trial Transcript, at 91.

The rest of the imported window shade fabrics -- Auris and
Paradis -- are produced by weaving strands of colorless glass
fibers into a mesh.  See Revised Pretrial Order, Schedule C, at ¶
4.  This mesh is then coated with either acrylic or PVC plastic.
As with Satinè, Nattè, and E Screen, the fabric is subjected to the
tenturing process.

The manufacturing process for Auris and Paradis results in
"sheets" of plastic.  "Sheet" is defined as a "material in the form

---

[9]This process is also known as chemofixation.  See Trial
Transcript, at 89.  The product is treated with heated air that
makes the PVC melt, allowing "every contact of the weft and the
warp to melt and to mix with each other."  Id.  Then the fabric
is cooled.  This results in the "welding of one plastic
monofilament to another plastic monofilament."  Id.  According to
Laurent Mangeolle, the director of production, this process has
no impact on the fiberglass core material.  Id. at 90.

[10]A "monofilament" is a "single strand of untwisted
synthetic fiber" or "thin flexible threadlike object."  The
American Heritage Dictionary 1168(3rd ed. 1996)("American
Heritage").  Because the fabrics contain individual coated yarns
that are untwisted, flexible, threadlike objects, Satinè, Nattè,
and E Screen are composed of plastic-coated fiberglass
monofilaments.

of a continuous stem covering or coating." Trial Transcript, at 28. "Sheet" may also be defined as "a broad, thin, usually rectangular mass or piece of material." American Heritage 1661; see also Sarne Handbags Corp. v. United States, 24 CIT __, __ 100 F. Supp. 2d 1126, 1136 (2000)(classifying a handbag with a plastic outer surface as "Handbags . . . [w]ith outer surface of sheeting of plastic"), Bradford Indus. v. United States, 152 F.3d 1339, 1340 (Fed. Cir. 1998)(referring to a non-woven textile dipped into liquid polyurethane as composed of a polyurethane sheet attached to a non-woven textile sheet). These two fabrics are formed by dipping a mesh of glass fibers into plastic, producing a broad, thin piece of material composed of a continuous coating of plastic. See Trial Transcript, at 29.

As stipulated in the pretrial order, for all of these fabrics the relative value and weight of the plastic is generally greater than the value and weight of the fiberglass. See Revised Pretrial Order, Schedule C, at ¶ 7. With the exception of Paradis, the relative value of the plastic is at least sixty percent. Id. The material composition of the window shade fabrics by weight is at least ten percent more plastic than fiberglass, except for two fabrics, Paradis and Auris. All of the fabrics' thin, flexible character is a result of the composition and manufacturing process of the window shade fabrics.

## B. Strength of Plastic and Fiberglass

Window shade fabrics need to be able to withstand a weight bar and constant movement either up and down or back and forth over the window. At trial it was demonstrated that neither plastic nor fiberglass alone has the strength necessary for these functions. Rather, manufacturers achieve the requisite strength by coating some core material with plastic, thereby making a stronger good. This core material serves two roles: it reinforces the plastic and gives the plastic support.

A plastic window shade fabric with no core material can be torn with relatively little trouble, as demonstrated by Dr. McCluney at trial. See Trial Transcript, at 180. An uncoated fiberglass window shade fabric would also fall apart easily. Uncoated fiberglass is very brittle and can be easily manipulated. Several witnesses at trial demonstrated the fragile nature of the fiberglass. A light touch to an uncoated fiberglass weave causes the material to come apart. Although fiberglass has a high tensile strength, uncoated, the fibers rub against each other permitting the fabric to break easily. Once the fiberglass is coated, it is embedded in the plastic, preventing the fibers from rubbing against each other.[11] The embedded fiberglass helps to strengthen the

---

[11]"To embed" a material means "[t]o fix firmly in a surrounding mass; to enclose snugly or firmly; to cause to be an integral part of a surrounding whole." American Heritage 600. The fiberglass is not visible upon viewing the fabrics. It is completely surrounded by the plastic coating. See Trial

10

plastic.

Although a core material is indispensable in order for the window shade fabrics to function, this material need not be fiberglass. Fiberglass is not the only core material used in similar fabrics in the window shade fabric industry. Several samples of window shade fabrics produced by Plaintiff's competitors, largely using polyester cores coated with PVC, were introduced at trial. According to Plaintiff's production manager, the core material could be a small metal wire or, presumably, even plastic itself. See Trial Transcript, at 107-08. The ability to substitute fiberglass with another core material demonstrates the dispensability of fiberglass in window shade fabrics.

## C. Function of the Window Shade Fabrics

The record at trial establishes that the principal concern of Plaintiff's customers is the control of solar radiation.[12] See id.

---

Transcript, at 12. Because it is not possible to separate the fiberglass and plastic once the plastic coats the fiberglass, the fiberglass is an "integral part of a surrounding whole." American Heritage 600.

[12]Generally, solar radiation is controlled by the solar optical properties - radiance, transmittance, reflectance - of the window shade fabrics. Besides the control of solar radiation, Plaintiff's customers are also concerned with outward visibility. Outward visibility refers to the ability to see out through the fabric, without others being able to see into the building. See Trial Transcript, at 8. Outward visibility is a function of the window shade fabrics' openness factor. See page 14 below.

11

at 8, 18, and 185.  Although the fabrics are also used for decoration, meet minimum safety and fire resistance requirements, and need to withstand continual opening and closing, on this record, these functions are secondary.  These secondary functions merely help the performance of the primary function.[13]

Plaintiff's sales brochures list the different fabrics and the solar optical properties for the window shade fabrics according to fabric type and color.  See Plaintiff's Ex. 2(a), 2(b), 2(c), and 4.  The properties listed within the brochures include the solar transmittance, reflectance, absorption and openness factor of the window shade fabrics.  See id.  Some of Plaintiff's customers are concerned with the fabrics' ability to reduce the glare for computer screens  See Trial Transcript, at 20.  Others buy

_____

[13]Customs argues that all of the enumerated functions of the window shade fabrics are primary functions.  Customs' expert witness, Dr. McCluney, however, testified that it was his belief that the primary function of the window shade fabrics at issue is to control solar radiation.  See Trial Transcript, at 185.  Although Dr. McCluney testified that window shade fabrics in general also reflect interior electric illumination, and that some consumers consider the appearance and color of the fabric to be more important than any other aspect of the window shade fabrics, he did not feel that either of these factors were primary to Plaintiff's customers.  See id. at 211 (McCluney testified that "in this particular product category, I believe they are sold primarily for the solar radiation controlling ability.").  Customs was, therefore, unable to rebut the evidence introduced by Plaintiff on the secondary nature of these functions.

Regardless, according to Timothy O'Grady, Plaintiff's vice-president and director of U.S. operations, the plastic, not fiberglass, is responsible for most of the secondary functions of window shade fabrics.  See id. at 12.

Plaintiff's fabrics to make their buildings more energy efficient. See id. The marketing of the window shade fabrics reflects that Plaintiff's customers' primary concern is the ability to control light and heat, not the decorative or safety value of the window shade fabric. Because the witnesses agreed in their testimony that the window shade fabrics are marketed for their ability to control solar radiation, much of the trial was devoted to Plaintiff's and Customs' expert witnesses' testimony about the different aspects of solar radiation and how the elements of the fabrics relate to these qualities.[14]

Both experts' testimony established that there are three important elements in controlling solar radiation: radiance, transmittance, and reflectance. These elements are not necessarily independent of another. Transmittance measures the amount of energy that comes directly through a material. See Trial Transcript, at 146-47. Reflectance, on the other hand, "is the ability of a material to reflect back . . . light or . . . solar energy." Id. at 115. Together, transmittance and reflectance affect absorption. Absorption refers to the amount of solar energy absorbed into or reflected from the fabric. See id. at 147.

Radiance, transmittance, and reflectance are each a function of the material, color, and weave of the window shade fabric.

---

[14]Both Plaintiff's expert witness, Mr. Tait, and Customs' expert witness, Dr. McCluney, are experts in the field of solar radiation.

Reflectance is primarily dependent on the color of the fabric. The color of the window shade fabrics at issue is a result of pigments in the plastic coating. Therefore, reflectance is a product of the plastic coating and not the fiberglass core.

The openness factor, on the other hand, primarily affects the transmittance of the product and visibility through the window shade fabric. The openness factor is a product of the weave, with minimal impact from the core material. Rather, it was determined at trial that the plastic stabilizes the weave pattern.[15] Because plastic is important in maintaining a uniform weave, it plays a significant role in preserving the openness factor, controlling the level of transmittance.

The parties' expert witnesses testified that the solar optical properties of the window shade materials at issue are not a function of the core material.[16] None of the plastic coatings are

_____

[15]See, _supra_, note 9.

[16]By motion, Customs tried to introduce new evidence after trial. This evidence included letters from Plaintiff to Customs describing fabrics similar to those at issue. Customs claims that this evidence was not available prior to or during the trial because of "an inadvertent copying glitch at Customs." Stratvert Decl., at ¶ 3. The Pretrial Order, however, provides that exhibits and witnesses not identified in the Pretrial Order shall not be considered "except upon prompt notice to all parties and to the Court, and upon a showing of good cause." Revised Pretrial Order, at ¶ 11. Customs' excuse of inadvertence does not constitute good cause. Moreover, there is no inconsistency between these letters and the facts and testimony in the record. The letters discuss the role of fiberglass in window shade fabrics with respect to functions this opinion considers secondary. The primary function of the window shade fabrics in

14

clear; therefore, the coloring of the plastic coating, not the color of the fiberglass, controls reflectance. The plastic also determines the uniformity of the weave, thereby affecting transmittance. According to Dr. McCluney, "the PVC is the controlling factor for the optical properties[,]" in the fabrics at issue. Trial Transcript, at 223. Mr. Tait likewise testified that the core material had "very little" effect on the solar optical properties of the fabric. Trial Transcript, at 122. Therefore, the plastic, both acrylic and PVC, gives the window shade fabrics their solar optical properties, which then determines the fabrics' ability to control solar radiation, their essential function.

## Conclusions of Law

The window shade fabrics must retain the essential character of articles of plastic, in order to be classified within chapter 39. The "essential character" test is explained in National Hand Tool Corp. v. United States, 16 CIT 308, 311 (1992). "Character" is defined as "'one of the essentials of structure, form, materials, or function that together make up and usually distinguish the individual.'" Id. (citing Webster's Third New International Dictionary (1981)). Whether the merchandise at issue

---

issue is the control of solar radiation, not flame retardance, temperature resistance, or tear resistance. None of the fiberglass functions addressed in the letters influences the finding that the essential character of the window shade fabrics is imparted by the plastic.

15

has the essential character of an article of plastic depends on whether the qualities imparted by the plastic are indispensable to the function of the article. See Better Home Plastics Corp. v. United States, 20 CIT 221, 227, 916 F. Supp. 1265, 1269 (1996), aff'd, 119 F.3d 969 (Fed. Cir. 1997)("The court finds that, when the indispensable function of keeping water inside the shower enclosure, along with the protective, privacy and decorative functions of the plastic liner are weighed against the decorative function and the relative cost of the outer curtain, it is the plastic liner that imparts the essential character upon the set.").

The factors that determine essential character "vary as between different kinds of goods." Explanatory Notes, at 4. Examples of such factors include the bulk, quantity, and weight of a material, as well as the role of the material in relation to the use of the product. See id. As previously noted, for the majority of the window shade fabrics at issue the relative value and weight of the plastic is greater than the fiberglass. See Revised Pretrial Order, Schedule C, at ¶ 7; see also Findings of Fact, supra at 9.

Not only does the plastic predominate by weight and value in the fabrics, but the plastic components determine the solar optical properties of the window shade fabrics. As we found above, the plastic maintains the stability and uniformity of the weave affecting the fabrics' level of transmittance. The plastic coating

also affects the level of reflectance because the color pigments are added to the plastic.  Because the primary function of the window shade fabrics is the control of solar radiation, and the plastic elements determine these properties, the window shade fabrics "retain the essential character of articles of plastic." Explanatory Notes, at 598.

The window shade fabrics, however, as goods that combine plastic and another material, must also satisfy the requirements of one of the subsections of the relevant General Explanatory Notes, in order to be classified in chapter 39.  Of the two relevant subsections, (a) and (d), it is clear that the fabrics do not meet the requirements of subsection (d).  The window shade fabrics do not have a hard, rigid character.  See Findings of Fact, supra, at 9.  As such, subsection (d) of the General Explanatory Notes to chapter 39 cannot be used to classify the goods in the chapter.

Subsection (a), however, can be used to classify the goods in chapter 39.  Subsection (a) refers to "[p]lates, sheets, etc." Explanatory Notes, at 598.  The General Explanatory Notes to chapter 39 also conclude that "[t]he provisions of the proceeding paragraphs apply, mutatis mutandis, to monofilaments, rods, sticks, profile shapes, tubes, pipes and hoses and articles." Id.  Auris and Paradis are "sheets" of plastic, thereby meeting this element of the General Explanatory Notes.  See Findings of Fact, supra, at 8-9.  The remainder of the fabrics, Satinè, Nattè, and E screen,

17

consist of monofilaments of PVC with a fiberglass core.  See id. at 8.  Therefore, subsection (a) applies to all of the window shade fabrics whether composed of sheets or monofilaments of plastic.

A second requirement of subsection (a) is that the "other" non-plastic material in the sheets or monofilaments, in this case fiberglass, must be "embedded" in the plastic.[17]  As discussed above, because the fiberglass is fully encompassed in the plastic and is an integral part of the surrounding whole, it is "embedded" in the plastic.

Finally, subsection (a) requires the "other" material to have only a supporting or reinforcing function.  See Explanatory Notes, at 598.  If the function of the fiberglass is more than to reinforce or support the fabric, the merchandise at issue is no longer essentially an article of plastic in accordance with GRI 1.[18]

Our findings demonstrate the reinforcing and supporting nature of the fiberglass.  Uncoated fiberglass cannot control solar radiation in a manner useful to Plaintiff's customers.  Rather, the glass fibers help to "strengthen [the window shade fabric] by

---

[17]"Glass Fibers" are explicitly enumerated as possible reinforcing or supporting materials.  Explanatory Notes, at 598.

[18]To reinforce a good is "to give more force or effectiveness to;  to strengthen by adding extra support or material."  American Heritage 1522.  Support is defined as "to bear the weight of; to hold in position so as to keep from falling, sinking, or slipping;  to keep from weakening or failing; strengthen."  Id. at 1804.

18

adding extra material." The fiberglass also supports the plastic, providing a material to which the plastic can adhere, thereby keeping the plastic from "falling, sinking or slipping." By only strengthening and supporting the plastic, the fiberglass performs a necessary skeletal function without bearing upon the window shade fabrics' primary function, the control of solar radiation.

**Conclusion**

On the record in this case, the indispensable role of the window shade fabrics is to control solar radiation. It is the plastic material, not the fiberglass, that is essential to this function. In addition, the plastic is of greater value and weight than the fiberglass. The fiberglass merely supports and reinforces the plastic, giving the fabric strength and durability. The General Explanatory Notes for chapter 39 explicitly provide for this type of good, a good where both components are necessary, but one performs a primarily reinforcing and supporting function. As these notes conclude, the mere presence of a fiberglass reinforcing material does not preclude classification of the fabrics as articles of plastic. Consequently, the window shade fabrics are articles of plastic in accordance with GRI 1.

For the foregoing reasons, this court finds that the Plaintiff has demonstrated that the window shade fabrics are properly classifiable under subheading 3926.90.9890, HTSUS. Customs is

hereby ordered to reliquidate the subject merchandise under subheading 3926.90.9890 and to refund all excess duties with interest as provided by law.

_____
Donald C. Pogue
Judge

Dated:     March 13, 2001
           New York, New York